## CRINER et al. v. MICRO-WESTCO, Inc., et al.

### No. 12612.

Circuit Court of Appeals, Eighth Circuit.

Jan. 7, 1944.

Rehearing Denied Feb. 2, 1944.

682

Otis A. Earl, of Kalamazoo, Mich. (A. G. Bush, of Davenport, Iowa, on the brief), for appellants.

Loyd H. Sutton, of Washington, D. C. (Evans & McCoy, of Cleveland, Ohio, Merrill M. Blackburn, of Davenport, Iowa, and Lloyd L. Evans and Frank S. Greene, both of Cleveland, Ohio, on the brief), for appellees.

Before STONE, THOMAS, and JOHNSEN, Circuit Judges.

STONE, Circuit Judge.

This is a suit for infringement of two patents (Numbers 2,110,290 and 2,195,641 issued to Harry J. Criner). From a decree holding the patents valid but not infringed and dismissing the petition, this appeal is brought by plaintiffs.

Each of the patents is a combination patent for a multiple bread slicing machine using endless band blades or saws. Each is made up of four elements: (1) opposed pulleys which support the band blades; (2) plurality of band blades crossed in figure 8 arrangement; (3) double sets of slotted blade guides (positioned, respectively, above and below the blade crossings—the bread loaf to pass between the two sets); and (4) a blade spacing element designed to adjust (widen or narrow) the space between adjacent cutting bands for the purpose of regulating the thickness of the bread slices.[1]

---

[1] A skeleton sketch of an end view of the type of machines covered by the patents and of that used by defendants will clarify the position of the spacing element.

A are the pulleys.

B are the band blades—each passing around the pulleys and crossing.

C are the upper and lower slotted blade guides (one pair (upper and lower) for each blade) which are attached to the spacing member.

D is the spacing member.

E is a platform over which the bread loaf enters the space C to C.

It is conceded that all of these elements, except that for blade spacing, and the combination of them were old in the art.[2]

The controversy here has to do with this spacing element and is whether the spacing device used by defendants infringes either that covered by claims 7 to 10, inclusive, of 2,110,290 or any of the twenty claims of 2,195,641.

The here involved claims (7–10) of 2,110,290 are, as to the spacing element, the broad claims of that patent. While the language of claim 8 differs slightly from that of the three other claims in one particular, it is identical in meaning and effect for purposes of this suit. The expressions in the three claims (7, 9 and 10) are a "transverse bar supported by the structure intermediate the supporting elements, a plurality of guide members slidingly mounted upon said bar corresponding in number to the blades and carrying slotted fingers adapted to receive, space and guide the blades, and means for uniformly drawing together or spreading the guide members upon the shaft."

While the language, as to the spacing element, in the various twenty claims of 2,195,641 differs, it is substantially identical in effect when read in connection with other language of the particular claim. Typical expressions frequently used are "spaced sets of saw guide-members disposed intermediate said pulleys" with "means for positively, simultaneously and uniformly adjusting said saw guide members toward or away from each other."

In determining non-infringement, the trial court based its results upon the following views. As to 2,110,290, he construed the claims "in connection with the drawings and specifications" of the patent; found the accused device contained no "bar or shaft as required by each of said claims"; no bar or shaft "upon which the guide members are slidingly mounted"; and, therefore, concluded that none of these claims "reads upon or is infringed" by defendants' machine. As to 2,195,641, he construed the patent as disclosing "a specific improvement over" the disclosure in 2,110,290; that, to obtain this patent, all of the claims had to be amended and limited "to restrict the

adjusting mechanism * * * to *positive* as well as simultaneous operation *in the sense that each of the guide members has an individual actuator powered from a common shaft*" (italics added); and that defendants' device was not "positive" in operation within this sense of the patent.

Appellants attack the determinations of the court for the following reasons: "In the first place, the claims read literally upon the accused structure, and in regard to the first patent in suit, the Court's holding that the claims are limited to a particular type of bar as a transverse bar is not justified, and as to the second patent in suit, the claims as to their face value read literally upon the accused structure and they even read literally upon the accused structure if the claims are to be construed as the District Judge has interpreted or rewritten them. Not only do the claims read literally upon the accused structure but the accused structure has the combination of elements recited in the claims, all coacting and performing the same functions and producing the same results in substantially the same way."

This presents the issues as to the language of the claims reading upon the accused machine and as to the accused machine being within the range of equivalents properly allowable to the claims.

 Generally speaking, an accused device must come within the language of a claim to be an infringement thereof although this is not necessarily and always true. However, it does not always necessarily follow that every device coming within the *language* of a claim is an infringement. The first is true because the patentee is entitled to nothing beyond what he is allowed in his claims. The second is true because of the practical and legal situation involved in the grant of patents.

 That situation is as follows. A patent is the grant of a monopoly for a useful novelty discovered by an inventor. This discovery is described in the drawings and specifications. The practical effect and education disclosed by the drawings and specifications may go far beyond the precise, exact device shown and always

[2] Criner testified "The machine disclosed in 2,110,290 was already known to me before my invention of that machine except for the provision for adjusting mechanism and the only novelty is the provision for adjusting the spacing of the band-saws * * *. The machine disclosed in 2,195,641 differs from the other only in using a positive adjustment in place of the spring adjustment" (used in 2,110,290).

they go beyond a mere "chinese" copy. Because of this situation, the claims are sought and are usually allowed in language sufficiently general to cover the possible scope of revelation—this protects the rights of the inventor. On the other hand, the grant is not intended nor allowed to be for more than has been fairly shown or suggested by the revelation to those skilled in the art. Claims are not insular but are integral parts of a patent and language therein must be construed in the light of and as parts of one entire instrument. Also, they must be construed in the light of the state of the art because the grant can properly be only for what is novel (in patentable sense). Sometimes claims must be further construed (often limited) by concessions made by the patentee in the course of obtaining the patent. Again, not infrequently the language in a claim is so general that, taken alone or at face value, it covers merely a function. The net result of this entire situation is that broad general language in claims is not to be taken literally at full face value but is to be construed and limited in the light of the above considerations. With these general observations, we pass to the particular problems here. This requires sufficient description of the devices revealed in the patents and by the accused machine and then a discussion of the issues of "reading" and of equivalents as to each patent.

*Patent 2,110,290.* Each blade guide (slotted to contain the blade) is rigidly attached to a support which is slidingly mounted on a bar or shaft along which extends a spline to prevent rotation of the supports. The outermost support is fixed to the shaft and the innermost support to a hub through which the shaft end—there threaded—passes. Each pair of supports is separated by a cupped spring sufficiently strong to move the supports—these springs having substantially the same weight and resistance so that they will exercise a uniform pressure upon the successive supports and thus space them uniformly upon the shaft. On the innermost shaft end is threaded a wheel outside of the hub. By turning the wheel inward on the shaft threads, the outer and inner supports are brought toward each other causing contraction of all of the springs and thus lessening the space between adjacent supports. Turning the wheel in the opposite direction acts to separate the end supports, allowing the springs to expand and thus widening the space between adjacent supports.

*Patent 2,195,641.* A shaft is revolvably mounted in hubs on the frame and with rigid hand wheels on the ends. Upon this shaft are slidingly mounted a plurality of "spacing rings." A second parallel shaft holds a slidable extension of each support thus preventing rotation while leaving longitudinal movement free. The periphery of each ring is finely threaded. Mounted on this same shaft are a multiplicity of blade guide supports having a central bore corresponding to and threadedly engaging the spacing rings, with a thin metal washer between the exposed end of each ring and the adjacent support. When the handwheels are operated in one direction the spacing rings, turning therewith and through action of their threaded periphery upon the supports, cause the supports to draw toward each other thus narrowing the intervening blade guide spaces. Opposite wheel movement produces a contrary spacing effect.

*Accused machine.* The blade guide supports are slotted to fit over headed bolts located at corresponding crossings of members of a staunch lazy tongs device. This device is suspended from threaded blocks. These blocks are mounted in slots on plates which carry substantially the entire weight of the blocks and the tongs device. Right and left-hand threaded screws extend through the threaded blocks. The screws rest upon their own journals and do not support the tongs mechanism. Bevelled gears on the ends of the screws mesh with gears on a splined shaft connecting the upper and lower guide assemblies. This shaft, acting through certain gears, causes the upper and lower assemblies to move in unison when the screw of one of the assemblies is turned by handle or otherwise. As the screw is turned one way by a crank or handle, the blocks on the ends of the tongs move toward each other causing the tongs to contract thus carrying the guides toward each other and lessening the intervening spaces. Contrary rotation of the screws causes the opposite result. Enclosing the guide members and lazy tongs of each of the two assemblies is a box-like structure consisting of a top supporting member, side members, end members and a lower cover. The top is secured to brackets and forms the main support for the structure and the contained mechanism. The side members function to keep the guide members in alignment. A small, square rod extends across the assembly at the upper set of guide members and serves to prevent up-

ward displacement of the guide members. The lower cover consists of a strap (designated in the exhibits by the numeral 34) across the center and anchored at its ends to the end members of the structure.[3] This strap is effective in preventing a sagging or "bowing out" at the center of the heavy lazy tongs when extended to the widest spacing of the guide members.

**As to infringement of No. 2,110,290.** The trial court found none of claims 7, 8, 9 or 10 read on the accused machine because each of those claims required "a transverse bar" upon which the spacing elements were "slidingly mounted" and because the accused device contained no bar performing such functions. The contention of appellants is that the housing box—very especially, the lower cover strap 34—are bars, or the bar, upon which the spacing members are slidably supported.[4]

We cannot agree with this contention. The principle of spacing regulation shown in this patent is that of control of the pressure of springs which separate and act upon the guide supports. So far as is revealed in the patent a bar, shaft, rod or similar element which not only supports but which carries the guide supports and springs is a necessity. Nothing more is taught by the patent and nothing more is covered in any of these claims. The accused device is not only different in construction but in principle of operation. No springs are used or usable. The spacing is accomplished through the operation of

---

[3] This form of lower cover is a development from and improvement over two earlier forms. The first form was a single plate completely covering the lower side of the box structure. It was intended to protect the moving parts of the enclosed mechanism from crumbs, dirt and dust. This form proved ineffectual as bread crumbs collected in spite of the cover. To provide access for easy removal of crumbs, the second form was accomplished by cutting away the center portion of the cover, leaving two straps only wide enough to insure that the bolts, holding the guides to the lazy tongs, would be confined within the assembly. The third or present form is an improvement in that the lazy tongs mechanism is almost entirely exposed and an accumulation of crumbs thereby prevented.

[4] The essential portion of the supporting argument in appellants' brief is as follows:

"In the structure of the patent, the guide members surround and slide upon the transverse guide member supporting bar. In the accused machine, as we have previously pointed out, the guide members are slidably supported between the top member or top plates 17 of the housing and a pair of bottom bars, as in the embodiment shown in Fig. 2, or a single bottom bar, as shown in Fig. 3 of Exhibit 7–B.

"It seems to us just plain word juggling to assert that these parts do not perform the function and the purpose and are not supporting bars for the guide members within the meaning of all four of these claims of this patent. The guide members are not supported by the lazy-tong structure. They are slidably supported on the bar 34, for example of Fig. 3, and whether this is called a strap or not would make no difference.

* * * The transfer bar of the Criner patent is not a shaft in the sense that it revolves or supports some rotating part. The word shaft has many meanings, but it is perfectly clear that it was used here in the sense of a support as the designated part had previously been referred to as a transverse bar. The sliding relation of the guide members to the supporting bars 32 or the supporting bar 34 is clearly illustrated in these Exhibits 7–B and 7–C.

"The guide members are supported against movement other than sliding movement in any direction; it is essential that that be done, and the accused structure is clearly designed to produce that result. The guiding members are slidably supported in this accused structure and they would be slidably supported if the lazy-tong adjusting means was removed. What we really have is that in the disclosure of the patent the guide members slidably embrace the bar on which they are supported and in the accused structures the guide members are slidable within the supporting member.

"We submit that to contend that the surrounding of the guide members by the supporting members or placing the guide members partially within the support instead of placing the support within the guide members is too fine a distinction to merit serious consideration by this Court."

The reference in this quotation to "Fig. 2" and to "the supporting bars 32" has to do with the second form of the accused device (see footnote 3 hereinbefore) when lower and upper straps were used instead of the central strap 34 as in the latest form.

lazy-tongs mechanism. The multiple straps used in the lazy-tongs shows an endeavor to make its operation as rigid as practically and economically possible.

Nor is the housing containing the lazy-tongs mechanism nor the lower cover straps 32 (in the second form) nor the strap 34 (in the present form) any equivalent of the bar or shaft called for in the patent. Parts of the housing perform functions relating to alignment of the lazy-tongs mechanism. This is particularly true of the straps 32 or the strap 34 because the entire machine is so constructed for operation that the spacing mechanism is tilted at an angle with the straps or straps below. In every substantial sense, the lazy-tongs mechanism is supported and carried by the end blocks mounted on plates. If the lazy-tongs mechanism were rigid enough to preserve its proper alignment, there would be no function for the straps to perform except as a partial enclosure. The sole function and purpose of the straps or strap—in so far as affecting operation of the spacing mechanism—is to prevent the lazy-tongs mechanism from getting out of alignment. There is no carrying of the lazy-tongs mechanism by the straps or strap and only such support as gravity imposes because of the tilt of the machine. We approve the determination of the trial court that this patent does not read upon nor is it infringed by the accused device.

*As to infringement of No. 2,195,641.* Each of these claims required a means for adjusting the spacing mechanism *"positively"* (italics added) as well as "simultaneously and uniformly." The trial court construed the file wrapper history of this patent to define or limit this italicised requirement to mean "that each of the guide members has an individual actuator powered from a common shaft." The contentions of appellants are: (1) that the definition or limitation of the "positive" requirement is not justified but the term was used solely to designate "positive means as distinguished from yielding means," such as the spring actuation in 2,110,290; (2) that, whichever of these two constructions is correct, the claims read on the accused machine; (3) that this combination patent is a pioneer "in the sense of being the first to provide means for automatically adjusting all the blades"; and (4) that, therefore, the patent is entitled to a range of equivalents which would include the accused machine.

■ Obviously, whether the claims read upon the accused device depends upon the definition to be given the "positive" or "positively" requirement. Our concern is with the meaning of that term *as used in the patent*. Fortunately, we are not driven to a choice of dictionary definitions because the patent itself and statements by the patentee appearing in the file wrapper[5] set

---

[5] The specifications of the patent state: "In order to accomplish the change of position of the blades lengthwise of the pulleys, and to do it smoothly, and to avoid adjacent blades coming in contact with each other and causing breakage or damage to the cutting edges of the blades, it is necessary to provide means which will cause the travel of all of the blades to take place simultaneously and which will prevent any one blade moving faster or farther than any blade adjacent thereto. To be sure that such travel of the blades occurs simultaneously as well as uniformly, it is necessary to provide positively driven means for actuating the blade guides and to avoid the irregularity of movement which may be produced by the springs or other resilient means heretofore inserted between the successive blade guides to exert pressure thereon in opposite directions.

"When such springs are used intermediate the successive guide members of an entire series, and the movement of the entire series is accomplished in one direction by exerting pressure upon both ends of the series toward the middle and in the other direction by the springs inserted between the adjacent guide members, it is obvious that, when pressure is exerted upon the opposite ends of the series toward the middle, the movement of the guide members will be successive and not simultaneous; that is, the movable end member, where only one end is movable, will be moved toward the rigid end member and by pressure upon the adjoining member, will cause such adjoining member to move. Thus the pressure and movement will begin at one end and travel through the entire series; and, while the ultimate result may be and if the springs are properly proportioned will be to space the various members in the series uniformly, this spacing will not take place simultaneously. A similar situation occurs where the middle member of any group is rigidly fixed to the shaft and the members from both ends move toward the middle when the spacing is contracted and travel away from the middle when it is expanded.

"It is one of the objects of my invention to avoid this irregular movement of

out the meaning of "positive" and "positively" as intended by the patentee. Thus defined, the term "positive" or "positively" is used to describe a device which will move the spacing members toward or away from each other both simultaneously and uniformly in a manner in distinction from devices which cause such movement yieldingly or progressively—such as was the asserted action of the spring device shown in 2,110,290. Of course, the terms positively, simultaneously and uniformly are used in

the spring actuated guide members by using positively driven threaded means to actuate all of the guide members simultaneously so that whether moving in a direction to contract or to expand the spacing of the guide members, they will all move simultaneously as well as uniformly and any irregularity of movement will be overcome by the positive driving action of the threaded spacing rings and supporting members hereafter described.

"In some of the claims I use the term 'positively' to mean that the adjusting movement of the blade guide members and the force producing such movement are in the direct control of the operator and are caused or controlled by him directly without the intervention or use of springs between the guide members or any power applied automatically between the guide members without the operator's control. This meaning applies to the use of this term in connection with the adjusting movement of the individual guide members of either set and either toward or away from each other. It applies also to the forms shown in both Figures 2 and 4. The term 'positively' is thus used to clearly limit and differentiate the apparatus claimed from the guides actuated in one direction by intermediate springs as shown in applicant's Patent No. 2,110,290, and the reasons requiring such positively actuated guide members are set out in applicant's amendment dated June 9, 1939."

The "reasons requiring such positively actuated guide members," as set forth in the above amendment dated June 9, 1939, are as follows:

"Applicant by amendment has inserted descriptive matter intended to more clearly distinguish the invention covered by this application from Criner No. 2,110,290.

"In this connection the Examiner's attention is called to facts which should be obvious to anyone familiar with the common variations in size, temper and power of springs intended to be similar or uniform.

"It is well known that without going to prohibitive expense in manufacturing processes, it is impossible to make springs in quantity production that will *exactly* be uniform in size or in material. Likewise, it is impossible to have them all tempered *exactly* alike or to have them exert *exactly* the same force either of tension or compression.

"Bread slicing machines commonly utilize blades which are approximately one-half an inch in width. When such blades are utilized to cut slices of bread three-eighths of an inch thick, considerable care must be exercised while adjusting the blades upon the pulleys to see that the blades do not touch each other at any point while traveling over the pulleys because if the blades do come in contact with each other, it might cause breakage, and would be certain to impair the cutting edges of the blades and dull them.

"This is particularly true where the lateral adjustment of the blades upon the pulleys is accomplished while the blades and pulleys are in motion; and especially where the tensioning devices are used to relax the tension of the blades during the adjusting operation.

"As pointed out by the amendment, the spring actuated devices for adjusting the spacing of the blades shown in Criner No. 2,110,290, while they should cause an ultimate uniform spacing of the blade guide members, will not act simultaneously but necessarily act in succession; just as a train of freight cars cannot start all of the cars of the train at the same instant, but the engine will start the first car, the first car will pull the second, the second will start the third, and so on down through the entire train of fifty or one hundred cars as the case may be.

"So in the spring-actuated bread slicers, the pressure upon the first spacing member causes the first spring to move and press against the second spacing member and causes it to press against the second spring, and so on through the entire series of thirty or more spacing members. This movement will not only be successive, but the relative rapidity of the movement of any given spacing member will depend to some extent upon the relative stiffness of the springs on each side of it and also to some extent upon the cleanness of the rod upon which the spacing members slide and whether the rods have been gummed up or obstructed by bread crumbs, rust or other means.

"The apparatus illustrated by applicant exerts a positive drive upon the spacing members in both directions and is not

a practical rather than a purely scientific sense. Whether the language of the claims —thus defined—read upon the accused device depends upon the "teaching" or revelation in the patent and upon the character of the accused device.

The only device revealed by the patent is one based on the principle of spacing members individually controlled through screw action from a common shaft. It contains no teaching of any adaptation of yielding or progressing mechanism which will render such mechanism sufficiently unyielding or rigid to enable it to cause satisfactory (in a practical sense) simultaneous and uniform adjustment of the spacing members. The accused lazy-tongs device is, in its nature yielding and progressive in operation. Appellees have overcome these defects—to a point of practical efficiency— by "compounding" the lazy-tongs by means of additional strips and by tightening the bolt joints. The result has been a much more rigid structure in operation than simpler forms of a lazy-tongs mechanism. Also, the effect of the progressive tendency of the tongs is reduced by movement (in or out from center) by both ends at the same time. Whether the claims of this patent should or should not be construed so narrowly as to cover only an individual spacing member screw mechanism, the accused device is so different in principle and problem that the claims do not "read" thereon.

---

subject to variation, but necessarily compels the several spacing members of the series to move simultaneously and to move uniformly.

"In this way applicant avoids the danger of one blade coming in contact with an adjacent blade by reason of irregularity of movement. The certainty and regularity thus provided by applicant makes it possible for the adjusting movement of the blades, concurrent with the movement of the spacing members, to cause the blades to move correspondingly upon the pulleys without danger of the blades coming in contact with each other.

"In order to secure this movement of the blades upon the pulleys in safety, applicant has provided the means which secure *positive, simultaneous,* uniform movement of the blade guiding members.

"No such provision is made in Criner No. 2,110,290.

"This distinction is clearly carried out in all of the claims of the present application.

"Claims 1 to 20 inclusive all include the word '*simultaneously*' as limiting the means for adjusting the blade guide members; and Claims 5, 6, 7, 8, 14, 15, 16, 17, 18, and 19 all include 'means for *positively* and *simultaneously*' as well as uniformly adjusting the guide members.

"Nowhere can these elements of 'simultaneously' and 'positively' be found in Criner, No. 2,110,290. They are a distinct step in advance which not only required the exercise of the inventive faculty to perceive that they were needed in order to insure safe, automatic travel of the blades on the pulleys, but they required invention over anything shown in Criner No. 2,110,290 to meet the requirements.

"It should be noted that while applicant has shown an eccentric bearing block to permit loosening or tightening the tension upon the blades to facilitate adjustment and operation thereof, the lateral adjustment of the blades may be accomplished without any change of tension if done while the machine is running, for lateral movement of the blades in their cutting courses will readily lead the portions of the blades in contact with the pulleys into line upon the pulleys with the adjusted position of the intermediate portions of the blades.

"It likewise should be noted that the positive adjusting movement of the blades laterally upon the pulleys cannot be accomplished automatically while the machine is not in motion.

"Any lateral movement of the blades in their contact with the pulleys, while the machine is still, would have to be accomplished by the application of manual or some other extraneous force to the blades at their places of contact with the pulleys; but when the lateral movement of the adjusting fingers is caused to take place while the machine is running, the blades are instantly and automatically directed upon the pulleys into the new lines occupied by the cutting courses of the blades and this automatic adjusting action takes place without regard to whether the tension of the blades upon the pulleys has been reduced or has been left at the normal operating tension.

"The importance of having this automatic movement take place in all the blades simultaneously, is evident from the fact that great danger of damage to the cutting edges and even of breakage would exist if the adjusting movement was not absolutely simultaneous both throughout the cutting courses of the blades and throughout their lines of contact with the faces of the pulleys."

■ But even though the language of the claims, as properly construed, may not read upon the accused device, yet it is a long established rule that such failure "does not settle conclusively the question of infringement." Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 568, 18 S. Ct. 707, 722, 42 L.Ed. 1136. Therefore, there remains for examination, the contentions that this is a pioneer patent and, as such, entitled to a range of equivalents which would include the accused device. Solution of these matters depends upon the state of the art when the disclosure, resulting in this patent, appeared.[6]

The commercial utility of machine multiple slicing of bread has been long obvious and, naturally, has resulted in various efforts to discover satisfactory machines. The necessity of having such bread slices uniform in thickness (in a practical sense) is clear. The usefulness of being able uniformly to change (within desirable limits) the thickness of the slices is evident. Such changes are matters of variations in the spaces between every pair of adjacent cutting elements (knives or saws). Hence it is clear that the prime requisite of space-changing devices is to make such changes uniform—thus insuring consistent thickness of bread slices after each change.

Operational economy and convenience naturally suggest the desirability of mechanisms which can make such changes with minimum expenditure of effort and of time; and, involved therein, is sometimes the feature of being able to make such changes without stoppage of the slicing machinery —thus arises the feature of making the changes *simultaneous* (in a practical sense) as well as *uniform.*

The requisite characteristics of space changes necessarily depended upon the type of cutting machine. Four general types of cutting machines are shown: (1) blades or saws fixed in a frame which was so moved as to force them through the bread or other food article; (2) revolving blades against which the bread or food article was brought; (3) reciprocating blades or saws against which the bread or food article was brought; and (4) moving band blades or saws against which the bread or food article was brought. While each of these types presented some problems peculiar to its type—in relation to space chang-ing—yet they were in the same art and had problems in common which would affect the scope of equivalents. The moving band type was the latest in time of use because of the difficulty of manufacturing band blades or saws of desired thinness which could stand the strain of operation. Hence, those seeking methods of space changing of moving bands had such teaching as the other types in the art afforded. By the time Criner came into the art with the discovery in this patent, there were four general types of space changers known in this and kindred arts. These were (1) the screw (exampled by O'Donel 227,643 and Walma 2,098,816), (2) the pin and graduated slot (exampled by Taylor 2,023,-360), (3) the spring (exampled by Korallis 954,112) and (4) the lazy-tongs (exampled by Holm 1,123,534 and Walma 2,023,362). The screw and the pin and slot types were similar in principle of operation. The spring and the lazy-tongs types were, in principle of operation, different from each other and from either the screw or the pin and graduated slot types. All of these types were known when the disclosure in this patent entered the field.

Because of difference in principle of operation of these types of space changers, the problems involved in applying any one of them to moving band saws were necessarily different and the mechanical solutions thereof required different lines of investigation. Therefore, a revelation or solution as to one type would rarely furnish any education in the art as to how solutions under other types might be accomplished. This conclusion is illustrated in this Criner patent. According to the specifications and the file wrapper, the prime, if not the sole, purpose of Criner in this patent was to get away from the defects which he regarded as inherent in the spring type. Those defects were, principally, the progressive or successive movement of the spring device and the manufacturing "impossibility" of making springs (in quantity production) sufficiently uniform in size, material and temper so that each would exert exactly the same force (either of tension or compression) as every other spring in the machine. He did not seek to remedy these defects by improvement of the spring device but went to an entirely different type —the screw—which worked on a different

---

6 We have studiously examined each of the numerous patents in the prior art cited by appellees. Detailed discussion of them in this opinion is not necessary. We confine ourselves to stating our broad conclusions as to their revelations.

principle. It would seem obvious that this patent contains no teaching useful to one who might seek a solution through developing a spring type device which would avoid the defects Criner saw in spring devices.

We cannot see why the same reasoning does not apply to the lazy-tongs type. Lazy-tongs had inherent defects which produced progressive and uncertainty of movement. There is nothing whatever in either of these Criner patents which would be of the slightest aid in enabling one skilled in the art to remove, remedy or lessen these inefficiencies in a lazy-tongs mechanism. The accused device is purely the result of remedying and lessening the inherent defects of the lazy-tongs to the point where, for the practical purposes in view, they became negligible. In view of the prior art, of the teachings of this patent and of the above differences in principles of operation, we regard this patent as in no sense a "pioneer" patent and as not entitled to a range of equivalents broad enough to cover the accused device.

Since we find no infringement of either patent, we refrain from examining the contention of appellees that the patents are invalid or the contention of appellants that the question of validity is not open on this appeal.

The judgment is affirmed.